## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

TIA FOSTER )
*AND* )
JESSICA HOBB )
*AND* )
JESSICA REED )
*AND* )
SHANITA HUGHES )
*AND* )
TERESA HINER )
)
)
On behalf of themselves and )
All others so similarly situated )
)
*Plaintiffs*, )
)
v. ) Case No. 7:14-cv-00698
)
GOLD & SILVER PRIVATE CLUB, INC. )
*AND* )
BILLY D. HARBOUR )
*AND* )
SOUTHWEST VIRGINIA INVESTMENTS, )
INC. )
*AND* )
MELONS, INC. )
*AND* )
JOHN A. CARTER )
)
*Defendants*. )

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR
## PARTIAL SUMMARY JUDGMENT

This case concerns the improper classification of the Plaintiffs who worked and

continue to work as exotic dancers at the Gold and Silver Club in the City of

1

Roanoke. The Defendants in this action have failed to pay the minimum wage required by the Fair Labor Standards Act. 29 U.S.C. § 201 et. seq. (herein "the Act" or the "FLSA"). After conducting discovery in this matter it is apparent that the Plaintiffs are entitled to Judgment as a matter of law on the issues of the Act's application and the classification of the Plaintiffs.

There are five named defendants in this matter, three of whom, are actual entities: Southwest Virginia Investments, Inc. ("SW Va"), Billy Harbour ("Harbour"), and John Carter ("Carter"). As discovery revealed, the two other defendants Gold and Silver Private Club, Inc. and Melons, Inc. are two non-entities in the ever evolving web of fictions that surround Harbour and Carter, created to evade their legal liabilities. Plaintiffs have undertaken the extraordinary task of trying to unravel these fictions in order to ask only for what is due to them under the Act and ask that the Defendants not be able to continue treating them and others similarly situated in total derogation of legal requirements.

## I. FACTUAL BACKGROUND

### A. FACTS RELATING TO THE DEFENDANTS' CONCERTED EFFORTS AT DECEPTION

Southwest Virginia Investments, Inc. was incorporated sometime in the mid-1990's. (SW Va P. 7, L 3-8). Billy Harbour purports to be its only shareholder. (SW Va P. 7, L 14-15.) It is currently in the business of nightclub management, running the Gold and Silver Club on Franklin Road in Roanoke, Virginia. (SW Va P.7, L 18-

2

23.) It was not established for the purposes of running the Gold and Silver Club – Mr. Harbour cannot recall for what purpose it was established. (SW Va P. 8, L 2-6). Harbour testified that, "**We** considered a couple of restaurant ventures and things. That's the only business that's really been involved in it." (SW Va P.8, L 9-12). Who "WE" is, is not clear.

According to Harbour, Southwest Virginia Investments has approximately 8 employees – excluding the misclassified dancers. (SW Va P 8, L 15-17). The dancers are not paid wages, but are paid through tips from stage dances and through money received for performing "couch dances." (Exhibits 7 and 9 ). The Club sets the couch dance fee at $20. (SW Va P. 61, L 22 to P. 62, L 2). The dancers and the Club split the couch dance fee. (SW Va, P. 62, L 8-19). Additionally, for every shift the dancers must pay to the Club a $1 ATM fee and a $5 jukebox/stage fee. (SW Va. P. 58, L 17-23). Dancers are subject to various fines, most notably for leaving early. (SW Va P. 36, L 13 to P. 37, L 4). Much of the Club's revenue is in the form of cash. The Club sells beverages and snacks from the bar. (SW Va P. 77, L3-10).

### 1. There is a concerted effort to hide the large amounts of cash flowing through the Club.

This is the second lawsuit concerning the misclassification of dancers that the Gold and Silver Club has defended. (SW Va. P. 56, L 1-3). Harbour has been aware since his last lawsuit that a prerequisite for enterprise (as opposed to individual) coverage under the FLSA is to have gross revenues in excess of $500,000 annually.

3

(SW Va P. 67, L 19-24.) Indeed he stated he was "very much aware of it." (SW Va P. 68, L 3). The facts demonstrate that there is both individual and enterprise coverage in this case, but the importance of the $500,000 figure is that the Defendants have taken great pains to assert it as their primary defense and then taken great care to destroy evidence of their revenues.

Harbour admits that all the males working at the Club are considered employees, and that in addition to their salaries he will give cash bonuses to them on good nights, and the amounts of these cash bonuses are not recorded anywhere. (SW Va P. 16, L 1-4). Defendant Harbour testified that he only began keeping records of the number of dances done by each dancer since January 2015. (See Cumulative Deposition Exhibit 3, SW Va P. 37, L 12-18.) The importance of the number of dances done per dancer cannot be understated – since this is primarily a cash business the number of couch dances done per night per dancer is one of the few reliable ways to determine the amount of cash flowing through the Club. As the evidence shows, Harbour's initial insistence that he never tracked the number of dances before January 2015 is not supported – even by Harbour's own testimony. He first testified that he started keeping Cumulative Deposition Exhibit 3 in January 2015 in response to this lawsuit. (SW Va P. 37, L 12-18). He then explained that he had previous to this lawsuit only kept a weekly total of the dances, like Cumulative Deposition Exhibit 5. (SW Va. P. 37, L 19 to P. 38, L 2). Harbour then explained that "a long time ago" he kept records of what individual dancers made (SW Va, P. 38, L 5-13)

4

and that when he heard that a lawsuit was being filed – about a year or so ago according to him (this action was filed December 22, 2014 and depositions were taken August 2015), he went to Kinkos with some unknown person and made a spreadsheet of the three original plaintiffs' earnings and dances. (SW Va. P. 38, L 7-15). These very detailed spreadsheets are Cumulative Deposition Exhibit 4. Then even as he anticipated litigation, according to Mr. Harbour he "saw no use" in keeping the alleged underlying notes from which he created Exhibit 4 and he "chucked them, threw them away." (SW Va. P. 38, L 22 to P. 39, L1). Harbour agrees that he created Exhibit 4 "in a possibility of litigation" and that he understood that there was a potential for a lawsuit and that he had "been through this circus before." (SW Va. P. 39, L 9-10 and P. 41, L 7-10).

Exhibit 4 is worth scrutiny because it goes back to 2011, and contains very specific data about the number of dances performed for each dancer and days worked per month. The numbers are quite specific, although Mr. Harbour testified incredulously that these numbers were just "estimates." (SW Va P. 41, L 14 to P. 43 L5). Harbour testified that he kept notes "pretty mainly [on] those three" – meaning Foster, Reed and Hobb (coincidently the three original plaintiffs in this matter). (SW Va P 43, L 17-20). Harbour's explanation for only having records – going back to 2011 for only these three dancers (out of 30 plus that work at the Club) is that he "possibly" anticipated in 2013 that Foster, Reed, and Hobb were going to file a lawsuit in December 2014. (SW Va P 44, L3-6). Plaintiffs have repeatedly asked for

5

the spreadsheets from other dancers – but Harbour unequivocally testified that spreadsheets exist only for these three, (SW Va P. 44, L 15-19) and that the individual dancer sheets – Exhibit 3 – exist only from January 2015. (SW Va P. 44, L 20-23). If all of this testimony seems unbelievable, that is because it is. As Harbour later testified Exhibit 4 represents the Clubs attempt to keep track of the hours worked and the money made by dancers to be sure they made at least $7.25 an hour -

Q: And you weren't keeping track of hours and the money made to make sure that they made at least 7.25 an hour?

A: Sometimes.

Q: Only since this lawsuit started?

A: I encouraged it.

Q: Since this lawsuit started?

A: No, we did some earlier. Not for that purpose, but we had that spreadsheet of where we were looking at what they were making per hour.

Q: Exhibit 4?

A: Yes.

Q: Exhibit 4?

A: We did our own math that they were making per hour pretty good.

Q: When did you do that?

A: Before the lawsuit ever started. I think there is no question that they made far past the minimum wage from the git-go.

6

(SW Va P. 96, L 8 to P. 97, L 2.) Defendant John Carter confirmed that he believes the Club did keep a spreadsheet tracking the number of dances done by each dancer. (Carter, P. 33, L 15-19). Carter also confirmed that the Club kept documents like Exhibit 3 since at least 2007. (Carter, P. 52, L18 to P. 53, L9). Clearly, Exhibit 4 represents a very detailed tracking by the Club of the number of dances performed by each dancer and would be a way to recreate the revenues of the Club, but SW Virginia insists they do not have anything beyond the three original Plaintiffs and whatever documents were used to create the spreadsheets were destroyed by Harbour after he anticipated litigation. Harbour also testified with relation to cumulative deposition Exhibit 8 which shows total dances for plaintiffs Hobb, Foster and Reed for 2015 that:

Q: So the first page is Jessica Hobb, who is River?

A: Uh-huh.

Q: And when was this created?

A: I don't know, I created it a week or two ago.

Q: How did you create it?

A: I had the notes, got somebody to help me and went over to Kinkos or somewhere and got it typed.

Q: What notes?

A: Just notes in the office. I asked the people to keep track of the girls, different people, managers, whatever, just keep track of them.

Q: And what did you do with those notes?

7

A: I don't keep them.

Q: You threw them away?

A: Oh, yeah.

Q: So the second page, third page, fourth page, fifth page are all Jessica Reed, Autumn, that's what they say?

A: Uh-huh.

Q: Yes?

A: Yes.

Q: And this is for 2015?

A: That is correct.

Q: And again, these were based—this is based upon notes that you then threw away?

A: Yes.

(SW Va. Deposition, P. 90 L 2 to P. 91, L3). Both prior to the institution of litigation, but while he anticipated it, and during the course of this litigation, Harbour on behalf of Southwest Virginia Investments admits that he destroyed relevant evidence in this matter. Creating other "evidence" in its place.

2. There is a concerted effort to hide who has knowledge of the Club's finances.

In response to Plaintiffs' First Interrogatories to Defendant Gold and Silver Club, Defendant Harbour informed the Plaintiffs that Mr. Gene Barnett was the Controller for the Club. (Defendant Gold and Silver Club's Responses to Plaintiffs' Interrogatories). At deposition Mr. Harbour testified

8

A: And there is another gentleman, his name is Dean [sic] Barnett. He does a lot of our maintenance for us and management. We usually pay him a couple hundred dollars a week or more.

Q: When you say "management" what do you mean?

A: I don't mean management, I mean maintenance and repairs. I misspoke management, I'm sorry.

Q: Is he someone who would have financial knowledge of the Club?

A: Yeah. Yes.

Q: What kind of financial information does he know about the Club?

A: What we spend.

Q: How is it that he comes by this information?

A: I'll talk to him about it what I've got available to spend.

Q: Does he keep books for the Club?

A: No.

Q: Does he function as a controller for the Club?

A: No

(SW Va P. 16, L 24 to P. 17, L 23). Later in the deposition when asked whether it was accurate to respond in discovery that Mr. Barnett was controller for the Club, Mr. Harbour responded, "I'd say that's accurate. I'd say part time would be more accurate." (SW Va P. 18, L 18-23). Mr. Barnett's role is described as a "computer whiz" who "helped me on some numbers and things," that he would meet Mr. Harbour at "Kinkos or somewhere and help me do a spreadsheet." (SW Va. P. 18, L

9

6-17). Nowhere in response to Plaintiff's written discovery did Defendant Harbour mention that John Carter has financial knowledge of the Club. (Defendant Gold and Silver Club's Responses to Plaintiffs' Interrogatories). Indeed from March 2015 since the Plaintiffs sent their first written discovery they requested any and all business ledgers for the Club, Defendant Harbour on behalf of the Gold and Silver Club stated that no general ledger existed. (Defendant Gold and Silver Club's Responses to Request for Production of Documents). Not until two days before Defendant Harbour's (30)(b)(6) deposition was a spreadsheet (Exhibit 11)[1] produced to the Plaintiffs.

Mr. Harbour testified that Mr. John Carter keeps the spreadsheet. (SW Va. P. 19, L 16-18). Harbour characterized Mr. Carter as "simply just the bookkeeper" who is paid $250 a week. (SW Va P. 20, L 8-11). Harbour was asked twice in the deposition whether Carter is someone who would have financial knowledge of the Club – first he responded, "He's a bookkeeper, I should hope so." (SW Va P. 19, L 18). Then he was shown his interrogatory responses where he failed to declare such knowledge, and upon being asked again responded, "I don't know." (SW Va P. 20, L 12-14). Mr. Harbour is unsure of whether Mr. Carter has financial knowledge of the Club, but he relied on the spreadsheet Carter keeps to do his taxes. (SW Va P. 20, L 15-18).

---

[1] It should be noted that the spreadsheet, that Harbour allegedly uses to prepare his taxes, does not include the payroll, nor does it record the revenue from the couch dances.

10

It should be noted that Mr. Harbour prepared the Club's 2013 and 2014 taxes during the pendency of this litigation, filing them on May 14, 2015, approximately three months before the spreadsheet used to create them was produced to the Plaintiffs. According to his deposition testimony he: (1) relied on the Quicken spreadsheet kept by Carter (Exhibit 11) to do these taxes; (2) was not sure what financial records Mr. Carter kept for the Club (SW Va P. 19, L 3-5) ; (3) and simultaneously hopes but doesn't know what financial information Defendant Carter may possess. Harbour does acknowledge that Carter is an employee of the Club, but he has no idea how many years. (SW Va P. 20, L 23 to P. 21, L 12).

## B. FACTS RELATING TO JOHN CARTER'S POSITION WITH THE CLUB.

In 2006 Defendant Carter allegedly loaned S.W. Virginia Investments and Reva Harbour, the mother of Billy Harbour $420,000. Since that time, Harbour and the Club make regular payments to John Carter, allegedly in satisfaction of a deed of trust on the building. (SW Va. P. 22, L 5-12). Harbour at the time of deposition had no idea what the balance of the mortgage as he has never been sent any statements as to the balance. (SW Va P. 22, L 17-20). The monthly payment is $5,073.50. (SW Va P. 23, line 4). Allegedly Twin Peaks LLC, of which John Carter is a partner, is the entity that holds the mortgage on the Club. (Carter, P. 18, L 5-6). However, Carter takes his payment for this alleged note in cash, and the Twin Peaks entity does not file taxes. (Carter P. 21, L 4- 5 and P. 18, L 8-10). Only for one year that the Plaintiffs are aware did this alleged note appear anywhere in financial records, as the

11

asset of Carter's other corporation Big Island Log & Lumber. (Exhibit 16). According to Carter the "asset" of SW Virginia Investments that appears on the taxes of Big Island Log & Lumber represents the balance on the note, but this does not match the one crumpled amortization page provided as evidence of the note's balance. (Exhibit 18). Carter testified that he does not actually know who owns the real estate to the building, that he has never seen a deed. (Carter P. 54, L 19-23).

What is clear is that John Carter is in charge of payroll for the people the Club does consider employees. (SW Va P. 24, L 16-19). Mr. Harbour, the alleged President and sole shareholder of the Club, had no idea how the payroll was handled nor what account the payroll comes from. (SW Va P. 24, L 16-23). Harbour, on behalf of the Club, testified that he did not know whether the Club retained records of the pay checks to the "employees." (SW Va P. 25, L 10-12). The paychecks, including Harbour's are signed JC Carter. (SW Va P. 25, L 17-22). Carter testified he does not keep Exhibit 11, the spreadsheet used to do SW Va Investments taxes, that it "comes from my bookkeeper, my payroll bookkeeper (his daughter). (Carter P. 23, L 11-19). She is apparently the bookkeeper for the bookkeeper, and yet another person that Defendants did not identify with financial knowledge of the Club. (Carter. P. 24, L 8-14). Interestingly, Exhibit 11 does not record payroll payments anywhere. John Carter has no training as a bookkeeper, and has never worked as a bookkeeper anywhere else. (Carter P. 47, L 5-9). Carter was aware that the dancers were classified as independent contractors, and was around when the Club was sued

12

previously. (Carter. P. 51, L 1-4 and P. 52, L 2-4). Carter was aware that the dancers were not on the payroll. (Carter P. 46, L 13-15). Carter owned and operated a Club in West Virginia, the Platinum Cabaret until 2015 where the dancers were also classified as independent contractors. (Carter P. 51, L 13-16). Carter insists that his sole role at Gold and Silver is as bookkeeper, but then testified later that in 2007 he had "no capacity whatsoever other than investor." (Carter. P. 53, L 10-11).

It is uncontested Carter applied for the credit card reader account, and informed the National Merchant Association on the application that he was the President and 100% shareholder of the Gold and Silver Club. (See Exhibit 6, Carter, P. 27, L 17-20). Carter also signed applications informing the National Merchants Association that the annual volume of the Club was approximately $540,000 a year, on multiple occasions. (Exhibit 6, and C). It is important to note that the application clearly states that rates and fees are based upon the proposed volume of transactions listed. If this was a misrepresentation, the Club gained benefit from it in this interstate transaction. John Carter controls the account that the credit card reader funds are deposited into. (SW Va P. 73, L 4-7). The ATM is owned by John Carter. (Carter, P. 36, L 6-7). According to Harbour as a representative of SW Virginia Investments, Carter uses the proceeds from the ATM he owns at the Club to pay the bills of the Club. (SW Va P. 73, L 17-23). The bank records related to the ATM show only regular large cash withdrawals of these ATM revenues. (Exhibit 19). Before January 2015 all Club bank statements went to Carter's personal address in Bedford.

13

(SW Va P. 73, L 8-10). John Carter purchased the "tables, chairs, miscellaneous, lights, sound, pool table." (SW Va P. 119, L 17 to P. 120, L 6). Carter is the only one with access to the payroll account – and is not sure who the owner of the account is, which is kept separately from the Wells Fargo operating account. (Carter P. 24, L 15 to P. 26, L 13). Defendant Carter has moved to quash the subpoena for this account.

The Club owned by Carter in West Virginia, up until 2015, was called the Platinum Cabaret. (Carter P. 8, L 13-16). It is located just across the border in Bluefield. Although SW Virginia denied any connection with the Club in Bluefield, another credit card reader application signed by Carter, also states that the legal entity responsible for the Bluefield Club is S.W. Virginia Investments. (Exhibit C). Obviously there is a financial connection between the two Clubs, at the center of which is John Carter. Unsurprisingly, Carter has moved to quash the subpoena for the Platinum Cabaret's bank records. (Docket # 54).

Despite, just being the bookkeeper, according to Exhibit 17, Carter was the second highest paid employee. According to Exhibit 17, for the same time period in which Carter, the bookkeeper, was paid $25,975, Harbour, the owner and sole shareholder, was paid $3,650. Despite being the bookkeeper and "in charge of payroll" Carter was not aware if Harbour received any other compensation. (Carter. P. 43, L 13-18). Although he writes the checks he does not know the salary of the Club managers. (Carter. P. 44, L 7-15). Whitney Carter (John Carter's daughter) was

14

paid $1,250 for the same time period in Exhibit 17, and despite him being the bookkeeper, John Carter testified that his daughter, "she does the books, the payroll." (Carter P. 45, L 13-14). Carter professed that he just writes the checks and pays whatever the people at the Club tell him. (Carter. P. 46, L 3-4). John Carter has a company debit card, Harbour does not. (SW Va P. 122, L 15-21). Clearly Carter's role is beyond that of "bookkeeper" and is this attempt at minimization is yet another example of concerted deception.

## C. FACTS RELATING TO PLAINTIFFS' MISCLASSFICATION

To be a member of the Gold and Silver Club one must sign a membership form. The application form states that "Members are bound together by appreciation of artistic exotic dancing and a common objective of fun recreation." (Exhibit 2). SW Virginia Investments agrees that the point of the Gold and Silver Club is to appreciate "artistic exotic dancing," and to commingle with others who appreciate talking about exotic dancing, but that "it works better when the girls are there obviously." (SW Va P. 30, L 2-10). The membership form also asks if a proposed member is "a law enforcement officer or affiliated with law enforcement agencies." (Exhibit 2). Harbour testified that "We just felt like it was a good thing to identify themselves, perhaps we could be of assistance." (SW Va P. 31, L 5-13). When Plaintiffs asked in this action for the membership list they were told that all membership records are destroyed, the Club has no idea who members are. (SW Va. P 31 L 20 to P. 32 L 6).

15

Defendant Harbour on behalf of SW Virginia Investments insists that the Club does not "hire" dancers – the Club simply allows them to dance at the Club as independent contractors – despite the fact that the form he drafted indicates that the plaintiffs were "Hired." (Exhibits 7 and 9). Dancers can be suspended by managers. (SW Va. P. 81, L 23 to P. 82, L 1). There is no special training required to be a dancer. (SW Va P. 35, L 1-3). Harbour agreed that the Club kept track of the plaintiffs in this lawsuit more closely than other dancers. (SW Va P. 36, L 5-7). Harbour agreed that there were fines for leaving early, he testified that the fines were in the past, but not in recent times. (SW Va. P. 36, L 10-16). He testified that those fines ended before the lawsuit was filed. (SW Va. P. 36, L 15-23). However, documents provided by the Club indicate that fines continued at least up until March 2015, well after this lawsuit was instituted. (Exhibit 3). Indeed, on February 28, 2015 at least five dancers were fined for leaving without permission. (Exhibit 3).

The Club pays for the general business expenses. (SW Va. P. 76, L 5-8). This includes general liability insurance. The insureds on the policy for 2014 are Billy Harbour and Reva Harbour (who died in 2011). (SW Va. P. 100, L 11-17). Mr. Harbour admitted that his mother was already deceased when he applied for the insurance. (SW Va P. 100, L 18-20). Until 2015 the Roanoke City business license of the Club was held by Gold and Silver Private Club, Inc. a corporation that Mr. Harbour doesn't know whether or not it ever existed. (Exhibit 1, and SW Va P. 101, L 7-10). The Club pays for the gas and water, the account holders of which are other

16

fictitious and/or no longer existing corporations– Juice Bars of America, Inc. (Exhibit D) and Girls, Girls, Girls of Va Inc. (Exhibit E). The Club buys the sodas that are sold at the Club. (SW Va P. 106, L 21-23. These are purchased from Walmart and Sam's Club. (Carter P. 55, L 20-22).The Club supplies the couches and chairs. (SW Va, P. 107, L 12-15).

The Club sets two shifts of dancers, 7:00 to 11:00 and 10:00 to 3:00. (SW Va P. 49, L 22 to P. 50 L 2). Dancers are supposed to stay to the end of the shift. (SW Va. P. 50, L 12-15). The dancers of had to follow certain rules: (1) no alcohol, (2) no drugs, (3) a preference for no boyfriends allowed. (SW Va P. 51, L 6 to P. 52 L 1.). Dancers have been suspended for violating the no boyfriends allowed at the Club policy. (SW Va P. 54, L 2-5). As late as March 2015 the Club still had fines for leaving without permission. (SW Va. P. 55, L 5-8). They must sign a "Dancer Application Form" which includes a space to note by whom they were hired. (SW Va P. 80, L 5-8). The "independent contractor agreement" requires that the dancers: 1. Agree to work full shifts and follow company guidelines; 2. Not consume alcohol or drugs; 3. That she be at least 18 years old; 4. Follow other unexplained "rules necessary for the safe and legal operation of the company."(Exhibits 7 and 9). Additionally, the dancers had to fill out a membership application which imposes additional requirements of: (1) Neat dress, (2) no foul language; (3) no cameras or recording. (Exhibits 7 and 9). The Club has, according to Harbour, an inoperative camera system, just for show, the employees are not informed that the cameras are

17

not actually watching their every move. (SW Va P. 105, L 11-20). The Club will offer advice and encouragement to dancers in order to teach her to make more money. (SW Va. P. 105, L 23 to P. 106 L 2).

## D. FACTS RELATED TO WILLFULLNESS

The Club is very well aware of the difference between an independent contractor and an employee, making the dancers sign independent contractor agreements. (SW Va. P. 55, lines 17-24). Indeed, the Club has been sued for this issue previously. (SW Va. P. 56, L 1-3). After the prior lawsuit the Club drew up a new contract but still treated the dancers as independent contractors. (SW Va. P. 56, L 10-13). The only investigation, according to Harbour he has ever undertaken to verify the proper classification of the dancers is to stop by the Virginia Employment Commission or "something" some time ago and talked to them about it briefly, and the VEC suggested that he start sending 1099's. (SW Va. P. 56, L 18-23). S.W. Virginia Investments agrees that it has never issued 1099 forms to the dancers, even though it considers them independent contractors, and it had absolutely no explanation why it does not do this. (SW Va. P. 112, L 18-20). According to Mr. Harbour before 2015 he never sought to investigate the difference between a W-2 employee and a 1099. (SW Va P. 58, L 13-16). As a representative of Defendant SW Virginia Investments, Harbour testified that his understanding of what constitutes an independent contractor includes being able to "come and go as they

18

want to." (SW Va P. 104, L 5-6). The Plaintiffs clearly were not able come and go without being fined.

## E. FACTS RELATED TO COVERAGE

The Plaintiffs are required to interact with the internet as part of their job, using the streaming music service Rhapsody.com to perform their dances. (SW Va P. 61. L 20-21 and Carter, P. 37, L 18-23). Dancers choose their own music from the service. (SW Va P. 11, L 11-13 and Carter P. 37, L 12-14). The dancers pay a $5 fee every time they work to support this service. (SW Va. P. 59, L 6-10). Patrons can pay the dancers for couch dances with a credit card, and dancers are required to accept credit card payments for couch dances. (SW Va. P. 62, L 23 to P. 63 L 3 and Carter P. 37, L4-11). The dancers must pay an ATM fee to "defray the costs of the ATM since they were the major beneficiary of the ATM." (SW Va. P. 23, L 7-12 and Carter P. 36, L 10-24). Southwest Virginia Investments agrees that "the ATM is integral to the dancers doing their job." (SW Va. at P. 23, L 16-19).

## II. ARGUMENTS AND AUTHORITIES

### STANDARD OF REVIEW

As this Court is aware, summary judgment is mandated if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Iota XI Chapter of SIGMA CI3I Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993). In addition, summary judgment is properly regarded not as a disfavored shortcut, but rather as an

19

integral part of the federal rules as a whole, which are designed "to secure the just, speedy and expedient determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 326. In opposition to such a motion, the non-moving party must produce "significantly probative evidence" from which a reasonable jury could return a verdict for the non-moving party. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924 (4th Cir. 1990). Factual disputes that are irrelevant or unnecessary will not preclude a grant of summary judgment. *Johnson v. Ouin Rivers Agency for Cmty Action*, 2001 U.S. Dist. LEXIS 6958 (E.D. Va. 2001). Moreover, a "complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." *McLean Contracting Co. v. Waterman S.S. Corp.*, 131 F. Supp. 2d 817 (E.D. 2001) *quoting Anderson v. Liberty Lobby.* 477 U.S. 242, 254, 106 S. Ct. 2505 (1986).

Many courts have ruled on the issue of exotic dancers at the summary judgment stage and found them to be employees, *See e.g. Reich v. Circle C Invs.*, 998 F.2d 324, 330 (5th Cir. 1993); *Thompson v. Linda & A., Inc.*, 779 F. Supp. 2d 139, 154 (D.D.C. 2011); *Butler v. PP&G, Inc.*, 2013 U.S. Dist. LEXIS 159417 (D. Md. Nov. 7, 2013); *Hart v. Rick's NY Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 944 (S.D.N.Y. 2013); *McFeeley v. Jackson St. Entm't, LLC*, 47 F. Supp. 3d 260 (D. Md. 2014). Similarly the facts are clear in this case that the Act is applicable to the dancers of the Gold and Silver Club and they have been and continue to be improperly classified as independent contractors. Based upon the undisputed facts they are entitled to Judgment as a matter of law on these issues.

20

**A. The Economic Realities clearly show that the Plaintiffs are Employees.**

The District of Maryland, most recently in *McFeeley* applied the economic realities test and found that dancers are in fact employees and should be compensated accordingly. The FLSA defines "employee" as "any individual employed by an employer." To "employ" includes "to suffer or permit to work." 29 U.S.C. §§ 203(e)(1), 203(g). The definition of employee is to be liberally construed and applied in accordance with the remedial nature of the Act. *Schultz v. Capital Int'l Sec., Inc.,* 466 F.3d 298, 304 (4th Cir. 2006). To determine whether an individual is an employee or an independent contractor under the FLSA, the court must look to the "economic realities" of the relationship between the worker and the putative employer by analyzing the following six factors:(1) The degree of control that the putative employer has over the manner in which the work is performed; (2) the worker's opportunities for profit or loss dependent on his managerial skill; (3) the worker's investment in equipment or material, or his employment of other workers; (4) the degree of skill required for the work; (5) the permanence of the working relationship; and (6) the degree to which the services rendered are an integral part of the putative employer's business. *McFeeley v. Jackson St. Entm't, LLC,* 47 F. Supp. 3d 260, 279 (D. Md. 2014). The focal point of the economic realities analysis is "whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic [reality], in business for himself."*McFeeley, supra* at 279.

21

## 1. The degree of control exercised by the Defendants necessitates a finding that the Plaintiffs are not independent contractors.

This Court must first consider the degree of control that the putative employer has over the manner in which the work is performed. In considering the degree of control exercised by the Club over the dancer, courts should look not only at the Club's rules and guidelines regarding the dancers' performances and behavior, "but also to the Club's control over the atmosphere and clientele." *Butler v. PP & G, Inc.,* 2013 U.S. Dist. LEXIS 159417 (D.Md. Nov. 7, 2013). Examples of Clubs exerting significant control include: fining dancers for absences and tardiness; enforcing behavioral rules; setting minimum performance fees; and requiring dancers to sign in upon arrival. *Id.; see also Reich v. Circle C. Investments, Inc.,* 998 F.2d 324, 327 (5th Cir. 1993) (finding significant control where the employer fined dancers, set minimum prices, promulgated rules concerning dancers' behavior, and required dancers to be on the floor at opening time); *Hart v. Rick's Cabaret Int'l, Inc.,* 967 F. Supp. 2d 901, 913-19 (S.D.N.Y. 2013) (holding that Club exerted significant control where it had written behavioral guidelines and imposed fines on the dancers); *Thompson, Inc.,* 779 F.Supp.2d at 148 (finding significant control where dancers were required to sign in, follow a schedule, and follow the Club's rules).

In this case the Club does all of the things that other courts have found indicative of a high degree of control, including having detailed behavioral rules for which a dancer can be suspended, fining the dancers for leaving without permission, setting fees and work shifts. Exhibit 3 shows how closely the dancers are monitored,

22

and even though the Club destroyed the records from prior to January 2015, Carter and the Plaintiffs both confirm these type of records were always kept.

## 2. The Plaintiffs' ability to earn more is entirely dependent upon the Club's rules.

The second element of the economic realities test is whether the worker's opportunity for profit or loss is dependent on her managerial skills. *See Schultz*, 466 F.3d at 305. "[T]he ability to generate more money based on skill and hard work denotes independent contractor status." *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F.Supp.2d 667, 674 (D.Md. 2000). In this case the amount the dancers stand to lose or gain is generally a function of the actions of the Club's work, not the entertainers. In *Harrell v. Diamond A Entertainment, Inc.*, 992 F.Supp. 1343, 1352 (M.D.Fla. 1997), the Court stated that:

> [a dancer] risks little more than [her] daily "tip out" fee, the cost of her costumes, and her time. That a dancer may increase her earnings by increased 'hustling' matters little. As is the case with the zealous waiter at a fancy, four star restaurant, a dancer's stake, her take and the control she exercises over each of these are limited by the bounds of good service; ultimately, it is the restaurant that takes the risks and reaps the returns.

This could not be more apparent than in the fees charged by the Club – namely the $1 nightly ATM fee paid by the dancers, which the Club explained is to support the ATM and defray its cost. The amount of cash generated by the ATM in fees is not shared with the dancers who pay to support it; their investment in that machine realizes no return. In this case, the fee patrons must pay for a couch dance is

23

established by the Club. The Club also has a required number of dances that a dancer must perform before they "max-out" – the point beyond which they no longer have to share the $20 fee with the Club. In explaining some of the many discrepancies in the tax returns of SW Virginia Investments, Harbour testified that the 45% increase in (reported) revenue between 2012 and 2013 was due to the Club increasing the number of dances that a dancer is required to split the fee with the Club (SW Va P 113, L19 to P. 114, L5). Clearly the Club is profiting from the work of the dancers.

### 3. The Defendants have significant capital investment in the Club.

The third element in the economic realities test is Plaintiffs' level of investment in the business, including their "investment in equipment or material, or [their] employment of other workers." *Schultz*, 466 F.3d at 305. In analyzing this factor, courts look to the capital investments made in the dance Club by the dancers and Club owners respectively. *Morse v. Mer Corp.*, 2010 U.S. Dist. LEXIS 55636, at *4-5 (S.D. Ind. June 4, 2010) (noting that "[a] dancer's investment in costumes . . . is relatively minor to the considerable investment [the Club] has in operating a nightClub. [It] leases fixtures for the nightclub . . . owns sound equipment and music, maintains and renovates the facilities, and advertises extensively") (quoting *Circle C. Invs.*, 998 F.2d at 327) (internal citations omitted). In this case the Defendants, and John Carter in particular, have a considerable investment in the building, the furnishings, and the general business expenses, bar items sold, and payroll for other

employees. Plaintiffs have none, except any costumes the Club requires that they provide. (Exhibits 7 and 9).

## 4. There is no special degree of skill required to be an exotic dancer.

The fourth element is the "degree of skill required for the work." *Schultz*, 466 F.3d at 305. Other courts have held that there is no special skill required to be an exotic dancer, pointing to the lack of instruction, certification, and prior experience required to become an exotic dancer. *Thompson*, 779 F.Supp.2d at 149-50; *Harrell*, 992 F.Supp. at 1351; *Morse*, 2010 U.S. Dist. LEXIS 55636; *Butler*, 2013 U.S. Dist. LEXIS 159417. Defendants agree in this case that there is no special skill or qualification required to be a dancer. (SW Va. P35, L1-3).

## 5. Courts provide little weight to the degree of permanence factor.

In previous cases involving exotic dancers, courts have found that the lack of permanence factor is "entitled to only modest weight in assessing employee status under the FLSA," and many courts have placed less emphasis on this element in comparison to the other elements. *Hart*, 967 F. Supp. 2d at 920; see also *Harrell*, 992 F.Supp. at 1352 ("Other courts have found that exotic dancers tend to be itinerant, but have tended to place less emphasis on this factor[;] . . . [t]his Court agrees, and places little emphasis on this factor."); *Reich v. Priba Corp.*, 890 F. Supp. 586, 593-594 (N.D. Tex. 1995) (noting that the proper focus under this prong is not on the permanence or exclusivity of the relationship, but the nature of the worker's dependence on the putative employer). The fact that dancers can work at other Clubs

25

"[does] not distinguish them from countless workers . . . who are undeniably employees under the FLSA — for example, waiters, ushers, and bartenders" — that may simultaneously work for other businesses. *Hart*, 967 F. Supp. 2d at 920-21. In this case, however, the evidence is that the Plaintiffs were for the most part not transient, but worked for multiple years and on a consistent basis. *See* Exhibit 4.

## 6. There is no disagreement that the presence of the dancers is essential to the functioning of the Club.

Courts have routinely noted that the presence of exotic dancers [is] 'essential,' or 'obviously very important,' to the success of a topless nightclub." *Butler*, 2013 U.S. Dist. LEXIS 159417. Defendants agree that the exotic dancers were an integral part of Defendants' business, especially considering that the Club does not serve alcohol or food, aside from a few snacks. The membership agreement in this case makes clear that the point of the Club is to appreciate exotic dancing and that "obviously" that works better when the dancers are present. (SW Va P. 30, L 2-10).

### B. There is Individual Coverage under the FLSA

Under the FLSA's individual coverage provision, any employee "engaged in commerce or in the production of goods for commerce" is covered by the Act, irrespective of whether his employer is an enterprise engaged in commerce as statutorily defined. 29 U.S.C. §§ 206(a), 207(a)(1)(b). "Commerce" means trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof.

26

29 USCS § 203. According to the Department of Labor's interpretation, employees are engaged in commerce "when they are performing work involving or related to the movement of persons or things (whether tangibles or intangibles, and including information and intelligence)" between states. 29 C.F.R. § 779.103. For example an employee is engaged in commerce when regularly using the mails and telephone for interstate communication, or when regularly traveling across state lines while working. *Id.*; *see also Joles v. Johnson County Youth Serv. Bureau,* Inc., 885 F. Supp. 1169, 1178 (D. Ind. 1995) ("An employee may participate in the actual movement of interstate commerce . . . by regularly using the instrumentalities of interstate commerce in her work, e.g., regular and recurrent use of interstate telephone, telegraph, mails or travel."); *Bowrin v. Catholic Guardian Soc'y,* 417 F. Supp. 2d 449, 477 (S.D.N.Y. 2006).

First, the Club agrees that all Plaintiffs were doing the same job, there is no special analysis that applies to any one individual. (SW Va P. 125, L 1-8). Additionally, the Defendants agree that the Plaintiffs are required to interact with the internet in order to perform the jobs, specifically they are required to use Rhapsody.com in the performance of their stage dances, which is owned and operated by Rhapsody International Inc. a Washington Corporation. Many Courts (including this one) have decided in a variety of other contexts that implicate commerce clause power (just as the FLSA does) that the Internet is an instrumentality of interstate commerce. *See AvePoint, Inc. v. Power Tools, Inc.,* 981 F. Supp. 2d 496, 522 (W.D. Va.

27

2013)(stating that "[b]ecause the internet is an 'instrumentality of interstate commerce,' courts have repeatedly held that the unauthorized use of a trademark on the internet satisfies the 'in commerce' requirement). *See also United States v. Morgan,* 748 F.3d 1024, 1045 (10th Cir. 2014); *Klein v. Verizon Communs., Inc.,* 920 F. Supp. 2d 670, 685 (E.D. Va. 2013);*United States v. Carson,* 2011 U.S. Dist. LEXIS 96867 (S. Dist. Ca. 2011)(" It is well-settled that the internet and telephone are instrumentalities of interstate commerce"). If interacting with this instrumentality of interstate commerce is required to fulfill the main function of the Plaintiffs' job, in this case dancing, then clearly they are engaged in commerce for the purposes of the Act.

Moreover the Plaintiffs' are required to use and/or support several other instrumentalities of interstate commerce. In this case the Plaintiffs not just had to process credit card payments, as other courts have found sufficient in the FLSA context to qualify as commerce, but had to accept them as a form of compensation. *See. e.g. Tae Kim v. Kum Gang,* 2015 U.S. Dist. LEXIS 39095, *76-77, n. 48 (S.D.N.Y. Mar. 19, 2015)(stating that FLSA coverage is also alternatively established based on evidence that each of the plaintiffs employed by defendants between 1997 and 2002 were "engaged in commerce" because they and other waiters reported that as part of their job they were required to process credit-card payments for guests and apparently did so with some regularity and frequency). In this case, the Plaintiffs are required to interact with the credit card processor, which is the National Merchants Association,

28

based in California in order to receive part of their compensation. This is much stronger than the act of simply processing because there is actual reliance on contractual assurances of the out of state credit card processor by the Plaintiffs in receiving the ultimate payment remittance for the couch dance. Undoubtedly this is engagement in commerce.

Finally, the Plaintiffs were required to pay to maintain the ATM on the premises, although they did not get to share in the rewards. The Defendants agree that use of the ATM is integral to the Plaintiffs performing their job, and that it is maintained for their benefit. The Eighth Circuit has held in the criminal context that an ATM is a "facility in interstate or foreign commerce." *United States v. Baker*, 82 F.3d 273, 278 (8th Cir. 1996). *See also United States v. Giordano*, 260 F. Supp. 2d 477, 482 (D. Conn. 2002)(approving of Baker, supra); *United States v. Tykarsky*, 2004 U.S. Dist. LEXIS 15392, \*7 (E.D. Pa. July 20, 2004)(also approving of *Baker* and stating that "[t]elephone networks and the Internet are undoubtedly 'facilities of interstate commerce'. Using a computer connected to the Internet equates to 'the use of a facility or means of interstate commerce,' even though the communications in question may have actually been intrastate in character.").

## C. There is also Enterprise Coverage under the Act.

"A claim may meet the FLSA's jurisdictional requirements under one of two provisions: the 'individual coverage' provision or the 'enterprise coverage' provision." *See Rains v. East Coast Towing & Storage, LLC*, 820 F.Supp.2d 743, 746 (E.D. Va.

29

2011). There is clearly individual coverage under the FLSA for each dancer. However there is also Enterprise Coverage, although the Defendants have taken great pains to destroy or hide evidence of it. An employer is subject to the FLSA's enterprise coverage provisions if it:

(A)(i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and

(ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated).

29 U.S.C. § 203(s)(1). Defendants agree that they sell beverages and snacks, including Coke products that are goods having traveled in interstate commerce (SW Va P. 77, L3-10). What they have posed as their main defense in this case is the second prong, that the Club makes less than $500,000 annually and will rely on what can be described generously as inaccurate tax records to do so. Defendant Harbour admits that these tax returns need to be amended after several discrepancies were pointed out to him in depositions. (SW Va P. 117, L20-22). The court cannot give any weight to these tax returns as Defendants have been unable or unwilling to provide the factual support used to create them. What is clear is that the actual records, which would reveal the revenues of the Club, which are largely in cash, have been purposely destroyed by the Club.

The Fourth Circuit has stated that "when a party either fails to preserve or destroys potential evidence in a foreseeable litigation, it can be deemed to have

engaged in the "spoliation of evidence," and a trial court may use its inherent power to impose an appropriate sanction." *Silvestri v. General Motors Corp.,* 271 F.3d 583, 590 (4th Cir. 2001). The "judicial response to a spoliation of evidence should serve the twin purposes of 'leveling the evidentiary playing field and . . . sanctioning the improper conduct.'" *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir. 1995). The duty to preserve evidence arises "not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri, supra* at 591.

In this case we know that Defendant Carter, represented to the National Merchant Association, one more than one occasion, that he is the President and 100% shareholder for the Club. He also represented to them that the Club did an annual volume of $540,000. (Exhibit 6 and Exhibit C). The number of dancers who work at the Club varies between 30-40. (SW Va. P. 47, L 1-5). Exhibit 4 shows a very detailed accounting of the dances done by the three original plaintiffs in this case. The Plaintiffs agree that the numbers in Exhibit 4 are generally representative, confirming that on average there are about 15 dancers present at the Club per night and that on average each dancer performs 7 couch dances (at $20 a dance). (Declarations of Foster and Hobb). According to the Club it is open every day. (SW Va P. 10, L 18 to P. 11, L1). That projected revenue is well in excess of $500,000. Plaintiffs are entitled to at least the inference that Exhibit 4 is representative of the

31

revenue generated by the other dancers and that the documents that Mr. Harbour "chucked" would have shown revenues in excess of $500,000.

## D. Defendants meet the requirements of willfulness.

A willful violation impacts the length of the appropriate limitations period under the FLSA. The FLSA provides two potential limitations periods, for non-willful FLSA violations, a two-year statute of limitations applies. When the violation is willful, a three-year statute of limitations applies. *See* 29 U.S.C. § 255(a). The "test" for willfulness entails a determination of whether "there is substantial evidence in the record to support a finding that the employer knew or suspected that his actions might violate the FLSA. Stated most simply, . . . the test should be: Did the employer know the FLSA was in the picture?" Or, as [the Court] opined in *Brennan v. Heard*, 491 F.2d 1, 3 (5th Cir.1974) (emphasis in the original), "an employer acts willfully and subjects himself to the three year liability if he knows, or has reason to know, that his conduct is governed by the Fair Labor Standards Act." *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 197 (5th Cir. 1983); *See also Donovan v. Grantham*, 690 F.2d 453 (5th Cir.1982); *Hill v. J.C. Penney Co., Inc.*, 688 F.2d 370 (5th Cir.1982). Neither an employer's good faith nor his ignorance of the governing statutes or regulations precludes a finding of willfulness. *Marshall v. Union Pacific Motor Freight Co.*, 650 F.2d 1085 (9th Cir.1981). In this case, Harbour as representative of SW Va Inc. testified that he had been through this "circus" before, that "he was very much aware" of the $500,000 enterprise threshold, and drafted an

32

independent contractor agreement after the previous lawsuit. There is evidence not just of knowledge, but of willful evasion.

## E. All three Defendants qualify as Employers for the purpose of this action.

An "employer" is defined under Section 3(d) of the Act as including "any person acting directly in the interest of an employer in relation to an employee." This term has been interpreted to encompass one or more joint employers. *Donovan v. Sabine Irrigation Co.*, 695 F.2d 190, 197 (5th Cir. 1983). A determination of employer status is not "circumscribed by formalistic labels or common-law notions of the employment relationship." *Id.* at 197. The parameters of § 203(d) are "sufficiently broad to encompass an individual who, though lacking a possessory interest in the 'employer' corporation, effectively dominates its administration or otherwise acts, or has the power to act, on behalf of the corporation vis-a-vis its employees." *Id.* No one factor is dispositive; rather, it is incumbent upon the courts to transcend traditional concepts of the employer-employee relationship and assess the economic realities presented by the facts of each case. *See Goldberg v. Whitaker House Cooperative,* 366 U.S. 28, 81 S. Ct. 933, 6 L. Ed. 2d 100 (1961). In *Donovan, supra* the Fifth Circuit approved of the trial courts discounting of "self-serving disavowals of involvement" and reliance instead on "the substantial evidence of [employer's] symbiotic association with various corporations owned and....dominion over the...office and resultant authority, however indirect, over the conduct of [the] business. *Donovan v. Sabine Irrigation Co.,* 695 F.2d 190, 197 (5th Cir. 1983).

33

In this case SW Virginia Investments, Inc. admits that its purpose is to manage the Gold and Silver Club. (SW VA Inv. P. 7, L18-23.) Additionally, Defendant Harbour, individually admits that he has a personal interest in the Gold and Silver Club, has been in charge of managing and controlling the Club, is a high level manager of the Club and classified the Plaintiffs as independent contractors. (Harbour, P. 13, L8 to P. 14, L1). Both are clearly employers under the Act. Additionally, John Carter is an employer under the Act. Although the Defendants self-servingly deny that Carter is an "employer" for the purposes of this suit, the facts are clear. First, the Plaintiffs all agree that John Carter has held himself out to be an owner of the Club. (Declarations of Foster, Hobb, and Hiner P. 16, L7 to P. 18, L 23). Managers at the Club have stated the John Carter is an owner. (Hiner, P. 21, L14 -16). Indeed, we have written evidence that Carter has held himself out to be in charge of the Club. (Exhibit A & C). Moreover, the undisputed facts from Harbour and Carter themselves show the total financial control that Carter has over the Club. Harbour, the purported President takes home very little as compared to Carter, the second highest paid employee. (Exhibit 17). Curiously, while he insists he is just a bookkeeper, he seems to have very little knowledge of the actual details involved. Instead he refers to his daughter as the bookkeeper. (Carter P. 23, L 11-19). Carter is the only one with control of the payroll account and is perfectly aware of how the dancers are compensated. (Carter P. 24, L 15 to P. 26, L 13). Carter also controls the account in which the credit card receipts are deposited – one of the instrumentalities

34

of interstate commerce that is required for the Plaintiffs to perform their job. (SW Va
P. 73, L 4-7). He also controls the ATM, a second instrumentality of interstate
commerce that is integral to the Plaintiffs performing their jobs. (Carter, P. 36, L 6-
7). According to Habour, Carter uses these proceeds to pay the bills of the Club. (SW
Va P. 73, L 17-23). Also, according to Harbour, Carter owns all of the furnishings
and equipment in the Club. (SW Va P. 119, L 17 to P. 120, L 6). It is clear that the
alleged mortgage note, of which little formalities are observed, is nothing more than a
cover for Carter's investment in the Club. In a very conventional sense, Carter is the
Plaintiff's employer because he holds the purse-strings, he controls the accounts and
the payroll. The economic reality is that the Club would not be able to function
without the resources of John Carter, making him very much an employer under the
Act.

## CONCLUSION

There is no doubt that the Plaintiffs are improperly classified, and deliberately
so. Defendants have taken great pains to create multiple corporations and entities to
hide the parties responsible for the Club – Harbour and Carter. They cannot be
allowed to approbate and reprobate at the same time, meaning they cannot claim
exemption from the FLSA and then destroy all documents that would show
otherwise. The Court should not ratify the misdeeds of the defendants by allowing
them to escape responsibility in this matter. For all of the above reasons the Plaintiffs

35

are entitled to Judgment as a matter of law on the above issues, and this case should

proceed to trial on November 9th and 10th on the issue of damages only.

> TIA FOSTER,
> JESSICA HOBB, and
> JESSICA REED
> SHANITA HUGHES
> TERESA HINER
> And All Others Similarly Situated

> By:   /s/ JOHNEAL M. WHITE
> Johneal M. White, Esquire (VSB #74251)
> GLENN ROBINSON & CATHEY PLC
> Fulton Motor Lofts
> 400 Salem Avenue, S.W. - Suite 100
> Roanoke, Virginia 24016
> (540) 767-2200 – Phone
> (540) 767-2220 – Fax
> *Email: jwhite@glennrob.com*

> Gregg C. Greenberg Esquire (VSB #79610)
> ZIPIN, AMSTER & GREENBERG, LLC
> 836 Bonifant Street
> Silver Spring, Maryland 20910
> (301) 587-9373 – Phone
> (301) 587-9397 – Fax
> *Email:  ggreenberg@zagfirm.com*

> *Counsel for Plaintiffs*

36

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of September, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Charles Allen, Jr., Esquire, 120 Church Avenue, S.W., Roanoke VA 24011 and Melvin Williams, Esquire, MEL WILLIAMS PLC 1320 3rd Street, S.W., Roanoke, Va. 24016.

/s   JOHNEAL M. WHITE